# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 3:16-CR-00033 |
| v. | |
| CALEB GUERRIER, | (JUDGE CAPUTO) |
| Defendant. | |

## MEMORANDUM

Presently before me are two Motions to Suppress filed by Defendant Caleb Guerrier. (Docs. 99 and 100). Guerrier contends that the incriminating physical evidence officers seized pursuant to a search warrant of his girlfriend's home must be suppressed because the information used to obtain that warrant was gleaned from an unlawful protective sweep. Guerrier also contends that the statements he gave to an officer after the protective sweep must be suppressed because he never received a *Miranda* warning. An evidentiary hearing was held on Guerrier's Motions, and, having been fully briefed, the Motions are now ripe for review. Because I find that the Government has met its burden and demonstrated the challenged protective sweep's reasonableness, and because I find that Guerrier was advised of his rights, Guerrier's Motions will be denied.

## I. Findings of Fact

Local police officers tasked to the Luzerne County Drug Task Force used a confidential informant to make two "controlled purchases" of crack cocaine from Guerrier in November of 2013. (*See* Doc. 115 at 9:7-25, 10:1-16). A valid arrest warrant was subsequently issued on March 14, 2014. (*Id.* at 5:12-22).

Officers Boyle, DeSimone, and Ference, among other Task Force officers, assembled on March 20 at 61 Caffrey Street in Wilkes-Barre, Guerrier's last known address, to arrest Guerrier. (*Id.* at 6:19-25, 7:1-10). When officers knocked on the door, though, they were greeted by someone else. As it turned out, Guerrier had not lived at 61 Caffrey Street for over a year. (*Id.* at 7:13-25).

After searching through "databases" available to law enforcement, it was determined

that Guerrier had recently listed 43 Marcy Court, Hanover Township as his address, so officers reassembled there (still on March 20) to effect Guerrier's arrest. (*Id.* at 8:4-25, 9:1-4). That address, incidentally, is where Guerrier slept, filed his taxes from, received his mail, and parked his car; it is also where his girlfriend and their two children lived.[1] (*Id.* at 79:17-25, 80:1-22, 84:4-25, 85:5-13). When they arrived at 43 Marcy Court, officers immediately noticed Guerrier's distinctive black car with one white door in the driveway. (*Id.* at 10:17-24). Ference and other officers set up a perimeter around the house—a duplex with a number of windows facing the street, two front doors, and a shared porch. (*Id.* at 11:1-17). DeSimone and Boyle, meanwhile, walked to the front door and knocked. (*Id.* at 12:4-8).

Guerrier answered the door. (*Id.* at 11:22-24). Within a matter of seconds, DeSimone and Boyle introduced themselves, explained they had a warrant for Guerrier's arrest, and handcuffed Guerrier in the doorway of the home just as he reached for the door handle to close the officers out. (*Id.* at 12:11-25, 13:1-14; 29:3-11, 39:12-14). They sat Guerrier down in the living room (which the front door opens into), and Ference came inside to assist. (*Id.* at 14:3-7, 29:8-11).[2]

The first floor of 43 Marcy Court has basically three rooms, laid out in a straight line

---

[1] Guerrier testified that he instead lived at a different home in Plains, Pennsylvania. (Doc. 115 at 84-85). If that were true (which I doubt it is), he would not have standing to challenge searches or seizures that occurred at 43 Marcy Court. *United States v. Agnew*, 407 F.3d 193, 196-97 (3d Cir. 2005).

[2] Guerrier's testimony that he was arrested on his front porch rather than in his doorway was not credible. Guerrier testified that although his car was parked in the driveway, he was waiting on his porch to be picked up by a friend named "Brenda" (whose surname maybe started with "M") to be driven to a court appearance in Weatherly, Pennsylvania. (*See* Doc. 115 at 81:4-11). On cross examination, Guerrier had little explanation for why he chose not to lock his front door (as he claimed officers let themselves in after his arrest on the porch) or why he could not remember Brenda's last name. (*See id.* at 81, 83). To top it off, no Weatherly court records were entered into evidence, and no Brenda was called to testify at the suppression hearing.

(a railroad layout): the living room which the front door opens into, a small middle area with a staircase leading to the second floor, then a kitchen at the other end of the home. (*See id.* at 20:6-15, 29:15-19, 30:4-10, 76:8-24). The staircase leads to two bedrooms: one for Guerrier's children; and another for Guerrier and his girlfriend, facing out toward the street and sitting above the home's doorway. (*See id.* at 31:8-25, 32:1-11, 43:5-12). The home is small, by all accounts. (*Id.* at 40:12-16, 41:9-18, 43:5-18; *see id.* at 77:5-8).

Guerrier's person was searched in the living room incident to his arrest. (*Id.* at 19:20-25, 20:1-7). When Ference entered the home, he immediately noticed children's clothing strewn about the living room and the sound of barking dogs coming from somewhere inside. (*Id.* at 40:8-25). Ference began conducting a "protective sweep" with another officer, starting on the first floor, looking for anyone who might be inside. (*Id.* at 41:19-23). The officers limited their sweep to places a person could have been hiding. (*Id.* at 34:3-15). The sweep of the first floor took about a minute. (*Id.* at 41:16-18). Ference noticed the barking was coming from pit bulls in cages in the kitchen, but found no one else (child or adult) on the first floor. (*Id.* at 40:17-25, 44:9-11). Ference then began sweeping the second floor. (*Id.* at 42:15-17). He went up the staircase and into the children's bedroom. (*Id.* at 42:25, 43:1-20). He noticed there were bunk beds, toys, and a closet in the small room. (*Id.*; *see id.* at 44:1-4) Nobody was inside, though. (*Id.* at 44:1-4). Ference then swept Guerrier's bedroom, where he saw the butt end of a handgun in plain view. (*Id.* at 43:21-25). Again, no one else was found inside. (*See id.* at 44:9-11). In total, the sweep of Guerrier's home lasted a few minutes. (*Id.* at 41:16-18, 46:13-15, 77:5-8).

After the protective sweep was completed, officers placed Guerrier in the back of a marked police car parked outside the house. (*Id.* at 77:5-18). Ference then called Officer Stefanowicz (of both the Hanover Township Police Department and the Luzerne County Drug Task Force) and informed him of Guerrier's arrest and the handgun he noticed during his protective sweep. (*Id.* at 34:23-25, 35:1-19). Ference and the other arresting officers wanted Stefanowicz on scene because 43 Marcy Court was within his jurisdiction, and because he could more easily apply for a search warrant. (*Id.* at 35:24-25, 36:1-4). When

3

Stefanowicz arrived, he spoke again with Ference and DeSimone about the arrest and protective sweep. (*Id.* at 50:2-13, 66:2-11). Stefanowicz then read Guerrier a *Miranda* warning off a printed card which the Luzerne County District Attorney's office had provided him, and which Stefanowicz always kept in reach.[3] (*Id.* at 50:21-23, 51:3-25, 52:1-2).

Stefanowicz asked if Guerrier would be willing to answer some questions, and Guerrier agreed. (*Id.* at 52:3-4). Stefanowicz mentioned that Ference saw a handgun during his sweep of the house, and asked Guerrier if there were other weapons inside. Guerrier answered "no, just that one." (*Id.* at 52:5-11). Stefanowicz then prepared an application for a search warrant for 43 Marcy Court which detailed the circumstances of the arrest and sweep, and noted Guerrier's statement. (*Id.* at 53:2-24, 56:2-25, 57:1-7). A search warrant was subsequently issued, and a search executed. (*Id.* at 57:18-22). Stefanowicz took part in the search of the home. (*Id.*). During the search, officers found in Guerrier's bedroom the handgun Ference noticed during his sweep, five more guns with obliterated serial numbers, cash, a digital scale, body armor, and bags customarily used for packaging drugs. (*Id.* at 58-62).

## II. Legal Standard

The burden of proof on a motion to suppress is proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974). "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "On a motion to suppress, the government bears the burden of

---

[3] I did not find Guerrier's testimony that he was not given a *Miranda* warning credible. Stefanowicz, a veteran police officer, testified that he read Guerrier his rights from a *Miranda* card he regularly kept on his person, a habit he picked up from a mentor. (Doc. 115 at 51:20-25). Given Guerrier's implausible testimony on other matters, I cannot credit his version of events here.

showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

### III. Conclusions of Law

As both sides acknowledged during argument on Guerrier's Motions to Suppress, whether Guerrier's statements to Stefanowicz should be suppressed turns on whether Guerrier received a *Miranda* warning prior to questioning. (Doc. 115 at 89:23-25, 98:9-12). Because I find by a preponderance of the evidence that Guerrier received a sufficient warning, his Motion to Suppress on *Miranda* grounds (Doc. 100) will be denied.

Guerrier's Motion to Suppress the physical evidence obtained from the search of 43 Marcy Court presents a more complicated issue: whether officers went too far during their protective sweep. A quick and limited, though warrantless, search of a residence incident to an arrest can be reasonable (and thus lawful) under the Fourth Amendment. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Such "protective sweeps" are meant to ensure "that the house in which a suspect is being, or has just been, arrested is not harboring other [dangerous individuals] who could unexpectedly launch an attack." *Id.* at 333. These sweeps are limited to a "cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. *Buie* sets forth two "prongs" under which a protective sweep may be considered reasonable. *Buie*'s first prong deems a sweep reasonable where, "as an incident to the arrest . . . , as a precautionary matter and without probable cause or reasonable suspicion, [officers] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Under *Buie*'s second prong, "[a] protective sweep is permitted, *inter alia*, when officers possess 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonable prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *United States v. Howard*, 729 F. App'x 181, 186-87 (3d Cir. 2018) (quoting *Buie*, 494 U.S. at 334). *Buie*'s second prong is available whether the defendant is arrested inside or outside the home; the first prong cannot apply if the defendant's arrest takes place outside or even "just outside the home,"

5

though. *United States v. White*, 748 F.3d 507, 511-12 (3d Cir. 2014).

Guerrier essentially argues that his upstairs bedroom was too remote a place for *Buie*'s first prong to apply, and that under *Buie*'s second prong, officers possessed insufficient articulable facts that any dangerous individuals might have been in the bedroom. (Doc. 101 at 5-10; Doc. 115 at 87-89). The Government responds that the officers' sweep was reasonable under *Buie*'s first prong because the upstairs bedroom was near enough to Guerrier's place of arrest and was a place from which an attack could be launched.[4] (Doc. 104 at 16-19; Doc. 115 at 93:18-19). The Government also argues that the sweep was justified because officers reasonably believed that, on the basis of children's clothing seen in the living room, there may have been children inside the house, hiding in fear or left in danger. (Doc. 104 at 23-27; Doc. 115 at 96:5-24).

I will start with that last argument. The Government argues that the protective sweep was justified under the "community caretaking" doctrine—*i.e.*, that officers searched the house for children pursuant to their community caretaking function, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). (Doc. 104 at 23-27; Doc. 115 at 96:5-24). That argument is a non-starter, though, because in the Third Circuit, "[t]he community caretaking doctrine cannot be used to justify warrantless searches of a home." *Ray v. Twp. of Warren*, 626 F.3d 170, 177 (3d Cir. 2010). "Circumstances involving the protection of a child's welfare," however, "may present an exigency permitting warrantless entry, but only if the officer reasonably believes that 'someone is in *imminent* danger.'" *Id.* (quoting *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996)); *see In re Sealed Case 96-3167*, 153 F.3d 759, 770 (D.C. Cir. 1998). But the Government has neither cited this standard nor referred to the "exigent circumstances" doctrine, instead choosing to rely on the community caretaking doctrine. (*See* Doc. 104 at 23-27; Doc. 115 at 96:5-24). In any

---

[4] The Government relies solely on *Buie*'s first prong. (*See* Doc. 104 at 20-22).

6

event, I need not address whether the "child welfare" exigency applies if the protective sweep was reasonable under the Fourth Amendment and *Buie*.

That brings me to Guerrier's argument, and the Government's response. I conclude that the protective sweep in this case was reasonable under *Buie*'s first prong—though just barely. The first prong is available because Guerrier was arrested just inside his home, in the doorway. *See United States v. White*, 748 F.3d 507, 511-12 (3d Cir. 2014). The key question here is whether the bedroom where Guerrier's handgun was found was a place "immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. This is a fact-specific inquiry that depends on the dwelling's "particular configuration." *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995); *see United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008). Small apartments, for instance, are more likely to contain "immediately adjoining" spaces than large homes are. *See United States v. Green*, No. 16 CR. 281 (PGG), 2018 WL 6413485, at *17 (S.D.N.Y. Dec. 6, 2018) (collecting cases). Additionally, courts have recognized "that officers may be at as much risk while in the area immediately outside the arrestee's dwelling as they are within it. 'A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another.'" *Burrows*, 48 F.3d at 1016 (footnote omitted) (quoting *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989)); *see id.* at 1017 n.9 ("An unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of the officers and others as does the assailant who attacks the officers upon entry.").

I conclude that Guerrier's bedroom immediately adjoined the doorway in which he was arrested, and was a place from which an attack could have been immediately launched. The testimony at the hearing established that the bedroom had a window facing the street—where officers were assembled and where Guerrier was about to be taken—and that the bedroom sat above the home's doorway. Additionally, the house was small, and its layout compact. Indeed, both Ference and Guerrier testified the sweep of the whole home took about two or three minutes. Guerrier's bedroom, facing the street, sitting above the

doorway, and near every other room in the house, was thus a place from which an attack could have been launched. *See United States v. Green*, No. 16 CR. 281 (PGG), 2018 WL 6413485, at *19-20 (S.D.N.Y. Dec. 6, 2018) (concluding a second floor bedroom loft immediately adjoined the place of the defendant's arrest in the first floor living room); *United States v. Howard*, 144 F. Supp. 3d 732, 742 n.10 (W.D. Pa. 2015), *aff'd*, 729 F. App'x 181 (3d Cir. 2018). Officers were therefore entitled to briefly sweep the bedroom to ensure no one was lying in wait. And officers did not "search beyond the confines of" the sweep, as testimony given at the hearing established "the brief nature and limited scope of the sweep," *United States v. Foley*, 218 F. App'x 139, 144 (3d Cir. 2007). (*See* Doc. 115 at 34:3-15, 41:16-18, 46:13-15, 77:5-8).

What puts this case near the fence is that: (1) officers arrested Guerrier just barely inside his home; (2) Ference swept the *entire* house; and (3) Guerrier's bedroom, although immediately above the doorway, was on a different floor. I find the reasoning of *United States v. Thomas*, 429 F.3d 282 (D.C. Cir. 2005) persuasive, though, on these points. As to the first point, it is true that Guerrier could have been moved outside and arrested; but here, like in *Thomas*, Guerrier was still standing inside his living room when officers grabbed him, and he was only fully under DeSimone and Boyle's control once all three were inside. *Id.* at 288. That the arrest began in the doorway and ended just inside in the living room, when it might have instead occurred outside the home, does not shift the calculus under *Buie*. *See id.* (officers need not remove an arrestee from his residence before "taking the precautionary measure of a limited protective sweep to avert a potential attack," even if the arrest occurred near the residence's exit). On the second and third points, "[t]he safety of the officers, not the percentage of the home searched, is the relevant criterion" under *Buie*. *Id.* at 287. "If an apartment is small enough that all of it 'immediately adjoin[s] the place of arrest' and all of it constitutes a space or spaces 'from which an attack could be immediately launched,' then the entire apartment is subject to a limited sweep . . . ." *Id.* at 287-88 (quoting *Buie*, 494 U.S. at 334). Here, just as in *Thomas*, Guerrier's home was small and compact enough that an attack could have been immediately launched from every room in

8

the house—particularly Guerrier's bedroom on the second floor, next to the stairway, directly above the place of arrest, and facing the street where officers were assembled. *See United States v. Green*, No. 16 CR. 281 (PGG), 2018 WL 6413485, at *17-20 (S.D.N.Y. Dec. 6, 2018). Accordingly, the protective sweep was reasonable under *Buie*'s first prong, and Guerrier's Motion to Suppress will be denied.

### IV. Conclusion

For the above stated reasons, Guerrier's Motions to Suppress will be denied.

An appropriate order follows.

| | |
|---|---|
| <u>April 26, 2019</u><br>Date | <u>/s/ A. Richard Caputo</u><br>A. Richard Caputo<br>United States District Judge |